UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN WILSON, et al., | Case No.17-cv-03763-JSC |
| Plaintiffs, | |
| v. | **ORDER RE: MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND ATTORNEYS' FEES** |
| TESLA, INC., et al., | |
| Defendants. | Re: Dkt. Nos. 47 & 51 |

Plaintiffs Brian Wilson, Carrie Hughes, and Katia Segal filed this wage and hour action against their employer, Tesla, Inc. and Tesla Motors, Inc. (collectively "Tesla"). Plaintiffs allege that Tesla misclassified them as exempt employees and failed to provide them overtime, rest and meal breaks, wage statements, and final wages. Plaintiffs' motion for final approval of their class action settlement agreement and motion for attorneys' fees, costs, and an incentive award is now pending before the Court.[1] (Dkt. No. 47 & 51.) After reviewing the briefs and relevant legal authority and with the benefit of oral argument on April 4, 2019 the Court GRANTS the motion for final approval and GRANTS in part the motion for attorneys' fees, costs, and an incentive award.

**BACKGROUND**

Tesla is an automaker and technology and design company that focuses on energy innovation. (Second Amended Complaint ("SAC") at ¶ 7.) Telsa does not sell its vehicles at

---

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 6 & 9.)

United States District Court
Northern District of California

dealerships, but instead uses a "factory-direct sales system with non-negotiable pricing," although it does have showrooms where a few cars are available for test drives and purchase.  (*Id*.)  Plaintiffs Brian Wilson, Carrie Hughes, and Katia Segal are or were employed by Tesla as Owner Advisors showing and selling cars in Tesla's showrooms.  (Dkt. No. 47-3 at ¶ 3.)  Until January 2018, Tesla classified its Owner Advisors as exempt under the commissioned salesperson exemption and compensated them by paying a salary as well as bonuses and commissions. (*Id*.)  Plaintiffs contend that they were misclassified as exempt employees and thus denied proper meal and rest breaks as well as overtime pay.  (*Id*.)

## THE SETTLEMENT

### A.  General Terms

The Settlement Agreement establishes a common fund of $1,059,851.40 inclusive of attorneys' fees, costs and expenses, incentive payments to the named Plaintiffs, payment to the Labor Workforce Development Agency ("LWDA"), employee-owed taxes, and administration costs including settlement administration fees.[2]  (Dkt. No. 51-3; Dkt. No. 51-2 at ¶ 3-4.)  Under the Settlement Agreement, the common fund shall be allocated in the following manner:

> (1) attorney's fees up to one-third of the fund ($333,333),
>
> (2) actual litigation costs of up to $20,000,
>
> (3) an incentive award for the named Plaintiffs of $10,000 each,
>
> (4) claims administration expenses up to $15,000, and
>
> (5) a $50,000 PAGA penalty, $37,500 of which shall be paid to the California Labor & Workforce Development Agency, and the remaining $12,500 shall be included in the net distribution to the class.

---

[2] The Settlement Agreement actually called for a common fund of $1,000,000; however, this amount also included Tesla's share of taxes, which, at preliminary approval, the Court noted should not be included in the actual settlement amount.  The Court thus preliminarily approved a settlement amount of $986,000, which excluded the $14,000 set-aside for Tesla's share of the taxes.  (Dkt. No. 33.)  Following preliminary approval, Tesla produced class data reflecting more workweeks than identified in the Settlement Agreement, triggering the escalator clause in the Settlement Agreement raising the settlement amount to $1,026,755. (Dkt. No. 51-2 at ¶ 3.)  After the distribution of class notice, Tesla determined that additional workweeks should have been included in the class data, which again triggered the escalator clause to increase the total settlement amount to $1,059,851.40. (*Id*. at ¶ 4.).

United States District Court
Northern District of California

(Dkt. No. 51-3 at ¶ 55; Dkt. No. 51-4 at ¶ 16.)  Following these disbursements, the remaining funds are distributed to the class members based on the number of workweeks worked.  (Dkt. No. 51-3 at ¶ 55(a).)  Class members will have 180 days to cash their settlement checks.  Any residue from the uncashed checks shall be paid by the Settlement Administrator to California's State Controller's Office for Unclaimed Property in the name of the class member.[3]  No settlement funds will revert to Tesla.

### B.  Class Members

The class is comprised of all employees of Tesla who worked in California from June 29, 2013 through January 28, 2018 as an owner advisor, sales advisor, or another similar exempt sales position.  (Dkt. No. 51-3 at ¶ 5.)  There are 282 class members.  Because this is not a claims made settlement (that is, class members do not need to submit a claim form to participate), and no class members have opted out of the settlement, all 282 class members will receive a pro rata share of the settlement.

### C. Notice

On November 2, 2018, ILYM Group, the Settlement Administrator, received the class data file from Tesla, which contained the name, social security number, last known mailing address, and total number of workweeks for each settlement class member.  (Dkt. No. 51-4 at ¶ 5.)  The list contained 282 individuals (the "Class List").  (*Id*.)  The Class List was then processed against the National Change of Address ("NCOA") database, maintained by the United States Postal Service ("USPS"), for purposes of updating and confirming the mailing addresses of the class members before mailing of the Notice Packet.  (*Id*. at ¶ 6.)

On January 11, 2019, the ILYM Group mailed the Notice Packet via U.S First Class Mail, to all 282 individuals contained in the Class List.  (*Id*. at ¶ 7.)  Of these, 16 were returned as

---

[3] Under the Settlement Agreement this amount was to be paid to the California Industrial Relations Unclaimed Wages Fund in the name of the class member, but the California Department of Industrial Relations has since "announced it will no longer accept checks arising from private litigation in which the Labor Commissioner was not involved and that the California State Controller's Office's Unclaimed Property Division will handle all unclaimed funds. In compliance with that announcement, all uncashed settlement checks will be deposited in the class members' name with California's State Controller's Office for Unclaimed Property." (Dkt. No. 51-1 at 9:21-25.)

United States District Court
Northern District of California

1    undeliverable.  The ILYM Group performed a computerized skip trace on the 16 returned Notice

2    Packets that did not have a forwarding address, in an effort to obtain an updated address for

3    purpose of re-mailing the Notice Packet.  (*Id.* at ¶¶ 10-11.)  As a result of this skip trace, 10

4    updated addresses were obtained and the Notice Packet was promptly re-mailed to those class

5    members, via U.S First Class Mail.  (*Id.*)  For the remaining 6, no further address information was

6    found.  (*Id.* at ¶ 12.)

7         The Notice Packet advised class members of the applicable deadlines and the date of the

8    final approval hearing, as well as how members could obtain additional information about the

9    settlement.  (Dkt. No. 51-4, Ex. A.)  Class members were provided an ILYM Group toll-free

10   number as well as an email address to make inquiries about the settlement.  (*Id.* at 12.)  Class

11   counsel also created a website regarding the settlement where it made available Plaintiffs' motion

12   for attorneys' fees and costs as well as other pleadings from this action.  (*Id.* at 16.)

13        On February 11, 2019, the ILYM Group mailed a reminder postcard, via U.S. First Class

14   Mail, to the class members.  (Dkt. No. 51-4 at ¶ 8.)  The postcard served as a reminder to the class

15   members of the deadline date to submit a request for exclusion, along with how to contact the

16   ILYM Group for more information on the Settlement.

17        As of March 20, 2019, ILYM Group had not received any requests for exclusion or to opt-

18   out.  (*Id.* at ¶¶ 13-14.)  The deadline to request exclusion or to opt-out from the Settlement was

19   March 12, 2019.  (*Id.*)

20   **D.  Release**

21        The scope of the general class release is:

22        Any and all claims, actions, demands, causes of action, suits, debts,
23        obligations, damages, rights or liabilities, of any nature and
         description whatsoever, know or unknown that have been, could have
24        been, or might in the future be asserted by Plaintiffs, or the Class
         Members or their respective heirs, executors, administrators,
25        beneficiaries, predecessors, successors, attorneys, assigns, agents
         and/or representatives arising out of any claims that were or could
26        have been encompassed in this Action, and any facts which
         reasonably flow from the facts alleged in Plaintiffs' Complaints.

27   (Dkt. No. 51-3 at ¶ 35.)  The named Plaintiffs have a broader release, releasing any claims under

28   California Civil Code section 1542 as well as the above claims.  (*Id.* at ¶ 36.)

4

**E.  Payments**

Within seven days of the Settlement Agreement's effective date, Tesla shall wire the settlement administrator the entire common fund amount of $1,059,851.40.  (*Id*. at ¶ 54.)  After deducting the fees award, costs award, incentive award, payment to LWDA, and administration fees, the remaining amount (the "Net Settlement Amount") will be disbursed to the class members.  (*Id*. at ¶¶ 24; 55.a.i.).  The settlement administrator shall disburse the individual settlement awards to the class members within 14 days by sending them a check to their last known addresses.  (*Id*. at ¶ 55.a.)  The size of each individual settlement award is based on pro rata shares calculated based on the number of weeks each class member worked compared to the number of weeks worked by all class members.  (*Id*. at ¶ 11.)

The individual settlement awards shall be allocated as follows: one-third as wages subject to all applicable tax withholdings, one-third as non-wage penalties not subject to payroll tax withholdings, and one-third as non-wage interest not subject to payroll tax withholdings.  (*Id*. at ¶ 55.a.iii.)

## PROCEDURAL BACKGROUND

Plaintiff Brian Wilson filed this action in June 2017 asserting seven claims for relief: (1) failure to pay overtime wages in violation of the FLSA; (2) failure to pay minimum wage in violation of California Labor Code section 1194; (3) failure to pay overtime in violation of California Labor Code sections 519 & 1194; (4) failure to provide meal breaks in violation of California Labor Code section 226.7 and IWC Order No. 4-2001; (5) failure to provide rest breaks in violation of California Labor Code section 226.7 and IWC Order No. 4-2001; (6) failure to provide proper wage statements in violation of California Labor Code section 226(a); and (7) unlawful business practices in violation of California Business & Professions Code section 17200 et seq.  (Dkt. No. 1.)  Prior to Tesla's appearance, Plaintiff amended the complaint to add Plaintiff Hughes and add a claim for failure to pay final wages in violation of California Labor Code sections 201 and 202.  (Dkt. No. 10.)

The parties engaged in an early mediation in November 2017 and were able to resolve the dispute with the terms finalized in May 2018.  (Dkt. No. 22-1 at ¶ 13.)  On the same day Plaintiffs

filed their motion for preliminary approval, they filed a second amended complaint adding

Plaintiff Segal, adding a PAGA claim, and withdrawing the FLSA claim.  (Dkt. No. 21.)   The

Court denied the motion for preliminary approval based on numerous issues with the notice and

settlement.  (Dkt. Nos. 24, 30.)  Plaintiffs then filed a renewed motion for preliminary approval.

(Dkt. No. 29.)  The Court held a hearing on August 30, 2018 and raised additional concerns

regarding notice and ordered Plaintiffs to file a new notice by September 13, 2018.  (Dkt. No. 31.)

Plaintiffs addressed the Court's concern and the Court granted the renewed motion for preliminary

approval on September 26, 2018.  (Dkt. No. 33.)  When Plaintiffs failed to file their motion for

attorneys' fees and costs by the deadline set out in the Court's Order and failed to otherwise

comply with portions of the Court's Order, the Court ordered Plaintiff to file a status report.  (Dkt.

No. 36.)  The Court then held a status conference at which the parties apprised the Court of

numerous issues which had arisen.  (Dkt. No. 42.)  In light of these issues, the parties submitted a

modified settlement agreement and notice for the Court's approval.  (Dkt. No. 43.)  The Court

granted the stipulation to modify the Settlement Agreement and Notice and set the Final Approval

Hearing for April 4, 2019.  (Dkt. No. 44.)  Plaintiffs filed their attorneys' fees motion on January

11, 2019.  (Dkt. No. 29.) Additional issues arose requiring yet another status conference and the

motion for final approval was finally filed on March 21, 2019.  (Dkt. Nos. 50; 51.)

### LEGAL STANDARD

Judicial policy strongly favors settlement of class actions.  *Class Plaintiffs v. City of

Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).  "To vindicate the settlement of such serious claims,

however, judges have the responsibility of ensuring fairness to all members of the class presented

for certification."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Where the "parties

reach a settlement agreement prior to class certification, courts must peruse the proposed

compromise to ratify both the propriety of the certification and the fairness of the settlement."  *Id.*

The approval of a class action settlement takes place in two stages.  In the first stage of the

approval process, the Court preliminarily approves the settlement pending a fairness hearing,

temporarily certifies a settlement class, and authorizes notice to the class.  *See Villegas v. J.P.

Morgan Chase & Co.*, No. CV 09–00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov.

United States District Court
Northern District of California

21, 2012). "At the [final] fairness hearing, presently before the Court, after notice is given to putative class members, the Court entertains any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. Oct. 8, 2014) (citing *Diaz v. Trust Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). Following the final fairness hearing, the Court must reach a final determination as to whether the parties should be allowed to settle the class action pursuant to their agreed upon terms. *See id.*; *Telecommc'ns Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

## DISCUSSION

## I. Motion for Final Approval

### A. Final Class Certification of the Settlement Class

Class actions must meet the following requirements for certification: 1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact common to the class; 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and 4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

In addition to meeting the requirements of Rule 23(a), a potential class must also meet one of the conditions outlined in Rule 23(b)—of relevance here, the condition that "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In evaluating the proposed class, "pertinent" matters include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

**1. Rule 23(a) Requirements**

In the Court's Order granting preliminary approval of the settlement, the Court found that the putative class satisfied the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a).  (Dkt. No. 33 at 6.)  The Court is unaware of any changes that would alter its analysis. Plaintiffs did not indicate in their papers that any such developments had occurred and the Court has not received any communications from Tesla otherwise.  Thus, all four of Rule 23(a)'s requirements have been met.

**2. Rule 23(b) Requirements**

In its Order granting preliminary approval of the settlement, the Court found that the prerequisites of Rule 23(b)(3) were likewise satisfied.  (Dkt. No. 33 at 6-7.)  The Court is unaware of any changes that would alter its analysis, and there was no indication in Plaintiffs' papers or at the fairness hearing that any such developments had occurred. Further, there were no objections by individual class members who claim to have an interest in controlling the prosecution of this action or related actions.

Accordingly, the Rule 23(b) requirements are met.

**3. Rule 23(c)(2) Notice Requirements**

Finally, if the Court certifies a class under Rule 23(b)(3), it "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  Rule 23(c)(2) governs both the form and content of a proposed notice.  *See Ravens v. Iftikar*, 174 F.R.D. 651, 658 (N.D. Cal. Jan 7, 1997) (citation omitted).  The notice must be "reasonably certain to inform the absent members of the plaintiff class," but Rule 23 does not require actual notice. *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994).

As the Court found in its preliminary approval order, the notice requirements were met here.  The revised notice describes the allegations and claims, included a definition of the class members, had contact information for Plaintiffs' counsel and the settlement administrator, a summary of the settlement amount outlining how the recovery was calculated both generally as

United States District Court
Northern District of California

8

well as for the specific class member receiving the notice, and it indicated that class members did not need to do anything to recover under the settlement, but that they could ask to be excluded or object to the settlement including the amount sought in fees.  Class members were also informed that they may appear at the final fairness hearing in person or through an attorney.  Finally, the notice also informed class members that receiving an award would release all associated claims.  The content of the notice was therefore sufficient to satisfy Rule 23(c)(2)(B).  *See Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'"  (citation omitted) ).

\* \* \*

Because the settlement class satisfies Rules 23(a) and 23(b)(3), and notice was sufficient in accordance with Rule 23(c), the Court will grant final class certification.

**B. Approval of the Settlement**

Having determined that class treatment is warranted, the Court now addresses whether the terms of the parties' settlement are fair, adequate, and reasonable under Rule 23(e).  In making this determination, a court typically considers the following factors initially set forth in *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566 (9th Cir. 2004): "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." *Id.* at 575.  The court need not consider all of these factors, or may consider others.  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("The factors in a court's fairness assessment will naturally vary from case to case.").

In *Bluetooth*, the Ninth Circuit explained that when "a settlement agreement is negotiated prior to formal class certification, consideration of these eight ... factors alone is" insufficient.  *Id.* In these cases, courts must show not only a comprehensive analysis of the above factors, but also that the settlement did not result from collusion among the parties.  *Id.* at 947.  Because collusion

"may not always be evident on the face of settlement, ... [courts] must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations." *Id*. The court identified three such signs:

> (1) when class counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but counsel is amply awarded[;]
>
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys fees separate and apart from class funds without objection by the defendant (which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class[;] and
>
> (3) when the parties arrange for fees not awarded to revert to defendants rather than to be added to the class fund.

*Id*. (internal quotation marks and citations omitted). For the reasons stated below, a review of these factors indicates that this settlement is fair, adequate, and reasonable.

### 1. The *Churchill* Factors

#### a. Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation

One important consideration is the strength of the plaintiff's case on the merits balanced against the amount offered in the settlement. *DIRECTV*, 221 F.R.D. at 526. Although this action reached settlement before the Court had occasion to consider the merits of the claims, the Court need not reach an ultimate conclusion about the merits of the dispute now, "for it is the very uncertainty of outcome in litigation and avoidance of wastefulness and expensive litigation that induce consensual settlements." *Officers for Justice v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). To that end, there is no "particular formula by which th[e] outcome must be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009); *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW-EMC, 2010 WL 1687832, at *9 (N.D. Cal. Apr. 22, 2010). Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Rodriguez*, 563 F.3d at 965 (internal quotation marks omitted). "In reality, parties, counsel,

10

United States District Court
Northern District of California

1   mediators, and district judges naturally arrive at a reasonable range for settlement by considering

2   the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of

3   obtaining it, discounted to a present value." *Id.*

4        Here, the SAC alleges Tesla failed to pay overtime, provide breaks, provide proper wage

5   statements, and pay final wages.  (Dkt. No. 21 ¶¶ 8-17.)  Plaintiffs allege these violations resulted

6   in unlawful and unfair business practices.  (*Id.* at ¶¶ 72-80.)  While Plaintiffs believe their claims

7   are meritorious, they concede continued litigation would present significant risks given Tesla's

8   insistence that employees were properly classified because their bonus and commission income

9   exceeded the employee's salary and that employees were in fact allowed to take rest and meal

10  breaks.  Plaintiffs further acknowledge the challenges with respect to class certification given

11  Tesla's argument that individual issues would predominate with respect to each of Plaintiffs'

12  claims.  For the misclassification claim, Tesla insists that to establish misclassification each class

13  member's wage statements would have to be reviewed making class treatment inappropriate.

14  (Dkt. No. 47-3 at ¶ 4.)  Likewise, for the unpaid wages claim, Telsa maintains that any overtime

15  hours were not recorded making damages very difficult to prove.  (*Id.* at ¶ 5.)  For the missed meal

16  and rest break claim, Telsa argues that decisions such as these were made at the individual store

17  manager level and thus could not be established on a class-wide basis.  (*Id.* at ¶ 6.)

18       Finally, all class members signed arbitration agreements as part of their employment

19  agreements which Tesla planned to move to enforce absent settlement.  (*Id.* at ¶ 8.)  Many of these

20  arbitration agreements contain class action waivers, and at the time the settlement was reached, the

21  Supreme Court had yet to issue its decision in *Epic Sys. Corp. v. Lewis*, 137 S. Ct. 809 (2017).

22  (*Id.*)  Shortly after Plaintiffs filed their motion for preliminary approval, the Supreme Court issued

23  its decision in *Epic* overruling the Ninth Circuit's holding in *Morris v. Ernst & Young*, 834 F.3d

24  975 (9th. Cir. 2016), striking down class action waivers in arbitration agreements. Thus, had the

25  parties not settled when they did, the viability of Plaintiffs' class claims would have been in

26  question.

27       In light of the risks and costs of continued litigation, the immediate rewards to class

28  members are preferable. All class members will receive an award on a pro-rata basis based on the

United States District Court
Northern District of California

1    number of weeks they worked compared to the number of weeks worked by all class members.

2    (Dkt. No. 51-3 at ¶ 55(a).)  The average class member payout is $2,440.29 with the highest

3    payment estimated at $9,497.80 and the lowest at $42.78.  (Dkt. No. 51-4 at ¶ 16.)  The benefit of

4    receiving this money now rather than later at some unidentified and uncertain time has its own

5    value.

6           Given the challenges Plaintiffs would face should this case move forward instead of

7    resolving, in contrast to the finality and speed of recovery under the parties' agreement, these first

8    two factors weigh in favor of approving the settlement.

9                          *b. Risks of Maintaining Class Action Status Throughout Trial*

10          In considering the third factor, the Court looks to the risk of maintaining class certification

11   if the litigation were to proceed.  As discussed above, Tesla (1) has represented that it will

12   aggressively oppose any motion for class certification, (2) contends that Plaintiffs' claim will be

13   difficult to prove on a class-wide basis given the absence of records and uniform policies across

14   showroom locations, and (3) insists that class members claims would have to be arbitrated on an

15   individual basis absent settlement.  (Dkt. No. 47-3 at 4 ¶¶ 3-8.)  In light of these difficulties in

16   certifying the class, the Court finds that this factor weighs in favor of approving the settlement.

17                                  *c. Amount offered in Settlement*

18          The fourth fairness factor, the amount of recovery offered, also favors final approval of the

19   settlement. When considering the fairness and adequacy of the amount offered in settlement, "it is

20   the complete package taken as a whole, rather than the individual component parts, that must be

21   examined for overall fairness."  *DIRECTV*, 221 F.R.D. at 527 (citation omitted).  "[I]t is well-

22   settled law that a proposed settlement may be acceptable even though it amounts to only a fraction

23   of the potential recovery that might be available to the class members at trial."  *Id.*  (collecting

24   cases).

25          Here, the parties agreed that Tesla will establish a settlement fund of $1,059,851.40.  (Dkt.

26   No. 51-2 at ¶ 5.)  After deducting the fees award, costs award, incentive award, payment to

27   LWDA, and administration fees, the remaining amount of at least $688,162.40 will be paid to the

28   class.  (Dkt. No. 51-4 at ¶ 16.)  Plaintiffs' counsel initially valued the claims here at between $5.6

to $4.867 million; however, in preparation for mediation, counsel valued the claims at approximately $2.1 million.  (Dkt. Nos. 29-2 at 19; 29-1 ¶ 16-20.)  At preliminary approval, Plaintiffs' counsel contended that the proposed settlement of $986,000 was 47% of the mediation valuation, but this included attorneys' fees, costs, and incentive awards.  In the preliminary approval order, the Court excluded these amounts noting that each class member share of $537,667 was 25% of the mediation valuation.  (Dkt. No. 33 at 11-12.)  As the Court noted then, this amount is fair and adequate and has only increased since final approval because of errors Tesla made initially regarding the workweek calculations.  (Dkt. No. 51-2 at ¶¶ 3-5.)  Further, as a result of the lawsuit, Tesla changed its practices to properly classify Owner Advisors as non-exempt, and provides overtime and breaks.  (Dkt. No. 47-3 at ¶ 10.)  Plaintiffs thus achieved substantial non-monetary relief in addition to the monetary relief provided under the settlement.

Finally, no class member has opted out of the settlement.  Although this is a non-claims made settlement and class members were not required to submit a claim to recover, that "the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).  The Court therefore concludes that the amount offered in settlement also weighs in favor of final approval.

### d.  Extent of Discovery Completed and Stage of the Proceedings

In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, "formal discovery is not a necessary ticket to the bargaining table."  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998).  Rather, the court's focus is on whether "the parties carefully investigated the claims before reaching a resolution."  *Ontiveros*, 303 F.R.D. at 371 (citation omitted).

Here, in preparation for mediation, Tesla provided Plaintiffs with discovery regarding the number of class members, its policies and procedures, timekeeping data, and payroll data.  (Dkt. No. 29-1 ¶ 12.)  The parties thereafter participated in an all-day mediation with an experienced mediator, and continued to work together for months after the mediation to formulate the Settlement Agreement.  (*Id*. at ¶ 13.)  Under these circumstances, the extent of discovery in this

United States District Court
Northern District of California

13

case favors the approval of the settlement.

### e. Experience and Views of Counsel

The experience and views of counsel also weigh in favor of approving the settlement. Plaintiffs' counsel has substantial experience in litigating complex class actions on behalf of employees. (Dkt. No. 47-3 at ¶ 16.) Ms. Martin attests that she has recovered substantial compensation on behalf of employees in at least three actions. (*Id.*)  Plaintiffs' counsel further attests that the recovery in this case is "significant given (1) the speed in which class members will receive their settlement payments, (2) the nonenforcement of potentially valid arbitration agreements and/or class action waivers that were purportedly entered into by class members and (3) Tesla's defenses that employees were properly classified because their bonus and commission income exceeded the employee's salary and Tesla's policy that its employees were entitled to take meal and rest breaks." (*Id.* at ¶ 10.)  Given counsel's experience in this field, her assertion that the settlement is fair, adequate, and reasonable supports final approval of the settlement. *See Hanlon*, 150 F.3d at 1026; *Rodriguez v. West Pub. Corp.*, 2007 WL 2827379, at *8 (C.D. Cal. Sept. 10, 2007) ("The trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties.").

### f. Presence of a Government Participant

Although no government entity is a party to this action, because this action was brought under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1715, Tesla was required to provide notice to the relevant state and federal officials under 28 U.S.C. § 1715(b). At the final approval hearing, Telsa advised the Court that the Section 1715 notice had not been sent.  However, on April 9, 2019, Telsa provided notice to the relevant authorities in accordance with Section 1715(b).  (Dkt. No. 53.)  This final approval of the parties' settlement thus follows the § 1715 service by more than 90 days. *See* 28 U.S.C. § 1715(d).

### g. Reaction of the Class Members

The settlement administrator identified 282 class members who were all provided notice of the settlement, although notice was returned and ultimately deemed unsuccessful for six class members.  As of this date, the Court is not aware of any class member who has filed an objection

14

1   to the settlement or the award. "Courts have repeatedly recognized that the absence of a large

2   number of objections to a proposed class action settlement raises a strong presumption that the

3   terms of the proposed class settlement action are favorable to the class members." *Garner*, 2010

4   WL 1687832, at *14 (internal quotation marks omitted); *see, e.g., Ontiveros*, 303 F.R.D. at 371–

5   72; *DIRECTV*, 221 F.R.D. at 529. Thus, the Court "may appropriately infer that a class action

6   settlement is fair, adequate, and reasonable when few class members object to it." *Garner*, 2010

7   WL 1687832, at *14 (internal quotation marks and citation omitted).

8        In sum, the *Churchill* factors weigh in favor of granting Plaintiffs' motion for final

9   approval of the class action settlement.

10       **2. The *Bluetooth* Factors**

11       Given that this settlement was reached prior to class certification, the Court must look

12  beyond the *Churchill* factors and examine the settlement for evidence of collusion with an even

13  higher level of scrutiny. *See Bluetooth*, 654 F.3d at 946. The question here is whether the

14  settlement was the result of good faith, arms-length negotiations or fraud and collusion. *See id.*

15  One of the three warnings signs that the Ninth Circuit identified arguably is present. However, for

16  the reasons described below, even if this warning signs exists the Court finds no evidence of

17  collusion between the parties. *See id.* at 950 (noting that upon remand the district court may

18  uphold the settlement notwithstanding the presence of all three of the *Bluetooth* warning signs).

19       First, the Court compares the payout to the class (actual and expected) to the unopposed

20  claim of fees by class counsel. *See Harris v. Vector Mktg. Corp.*, No. C–08–5198-EMC, 2011

21  WL 4831157, at *6 (N.D. Cal. Oct. 12, 2011). The settlement agreement provides that Plaintiffs

22  are entitled to reasonable attorneys' fees in an amount not to exceed one-third of the settlement

23  amount, or $333,333.33, and the notice states that Plaintiffs will seek an award of attorneys' fees

24  of up to $333,333.33. (Dkt. Nos. 51-3 at 21; 51-4 at 10.) In its Order granting preliminary

25  approval of the settlement, the Court indicated that it had serious concerns regarding a request for

26  fees based on 33.3% of the settlement fund given that the Ninth Circuit has identified 25% of the

27  fund as a reasonable benchmark, *see Bluetooth*, 654 F.3d at 942. (Dkt. No. 33 at 15.) In their

28  motion for attorneys' fees, Plaintiffs reduced the amount of fees sought to 25% of the settlement

1    fund.  Because Plaintiffs' request for attorneys' fees is now within the Ninth Circuit's 25%

2    benchmark, the Court concludes that this *Bluetooth* warning sign is not present.

3         The second warning sign—a "clear sailing" provision—is present here: the settlement

4    agreement states "Defendants shall not oppose or object, and shall file a statement of non-

5    opposition, to Plaintiffs' request for an award of attorneys' fees in an amount not to exceed Three

6    Hundred Thirty-Three Thousand Three Hundred Thirty Three Dollars and Thirty Three Cents

7    ($33,333.33.)  (Dkt. No. 51-3 at 21.)  "The very existence of a clear sailing provision increases the

8    likelihood that class counsel will have bargained away something of value to the class."

9    *Bluetooth*, 654 F.3d at 948 (internal quotation marks omitted).  "Therefore, when confronted with

10   a clear sailing provision, the district court has a heightened duty to peer into the provision and

11   scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to

12   avoid awarding 'unreasonably high' fees simply because they are uncontested."  *Id*.

13        The third warning sign—whether the parties have arranged for fees not awarded to the

14   class to revert to defendants rather than be added to the class fund, *see Bluetooth*, 654 F.3d at

15   948—is not present here.  The settlement agreement expressly states: "No portion of the

16   Settlement Amount shall revert to Defendants or result in an unpaid residue," and that the funds

17   from uncashed checks will be sent to the California Department of Industrial Relations Unclaimed

18   Wages Fund, with the identity of the Participating Class Member to who the funds belong.[4]  (Dkt.

19   No. 51-3 at 18:13-14; 19:19-21.).

20        Notwithstanding the existence of the one warning sign, the Court finds that the settlement

21   did not result from, nor was influenced by, collusion.  First, the settlement adequately satisfies the

22   class members' claims, which is reflected in part by the absence of objections to the settlement.

23   Second, the Court finds no evidence of explicit collusion here, where the parties exchanged

24   discovery and engaged in settlement discussions overseen by an experienced neutral mediator

25   before agreeing on this settlement.  Considering the scope of litigation and the nature of the

26

27   ───────────────

     [4] As noted above, given a change in policy by the California Department of Industrial Relations,
28   all uncashed settlement checks will actually be deposited in the class members' name with
     California's State Controller's Office for Unclaimed Property.

                                              16

United States District Court
Northern District of California

negotiations process, the Court is satisfied that the settlement is the product of successful arms-length negotiations. *See Bluetooth*, 654 F.3d at 948 (holding that participation of a mediator is not dispositive, but is "a factor in favor of a finding of non-collusiveness").

## II. Motion for Attorneys' Fees, Costs, and Incentive Award

Next, the Court must determine whether the requested attorneys' fees and expenses, the settlement administrator costs, and the class representative's incentive award are fair and reasonable. For the reasons set forth below, the Court reduces both the amount of fees and costs sought as well as the requested incentive award.

### A. Attorneys' Fee Award

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. Pro. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941. In diversity actions such as this, state law applies to determine the right to fees and the method for calculating them. *See Mangold v. California Pub. Utilities Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995). As Plaintiff's underlying claims are state law claims, the Court must apply California law on attorneys' fees.[5] *See Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1047 (9th Cir. 2002).

The California Supreme Court has held that courts have discretion to choose among two different methods for calculating a reasonable attorney's fee award. *See Lafitte v. Robert Half Int'l Inc*., 1 Cal. 5th 480, 504 (2016). The first is the "percentage method," where "the fee" is calculated "as a percentage share of a recovered common fund or the monetary value of [the] plaintiffs' recovery." *Id*. at 489. The second potential approach is "[t]he lodestar method, or more accurately the lodestar–multiplier method." *Id*. at 489. Under the lodestar method, the fee is calculated "by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate," then "increas[ing] or decreas[ing]" the lodestar figure based on "a variety of . . . factors, including the quality of the representation, the novelty and complexity of the issues, the

---

[5] Plaintiffs dismissed their FLSA claim the same day they filed their motion for preliminary approval; their remaining claims are under California law. (Dkt. No. 21.)

United States District Court
Northern District of California

United States District Court
Northern District of California

results obtained, and the contingent risk presented." *Id*. (citation omitted). "The choice of a fee calculation method is generally one within the discretion of the trial court, the goal under either the percentage or lodestar approach being the award of a reasonable fee to compensate counsel for their efforts." *Id*. at 504.

### 1. Analysis

Plaintiffs request fees of $256,689, which amounts to 25% of the common fund. (Dkt. No. 47-1.) The Martin Declaration submitted with the motion for attorneys' fees included a chart which provided general billing categories and hours and calculated Plaintiffs' lodestar fees as $160,895 based on 300 hours of work. (Dkt. No. 47-3 at ¶ 13.) Because the Court had previously ordered counsel to submit detailed billing records with the motion for attorneys' fees (Dkt. No. 33 at 15), at the final approval hearing the Court again ordered Plaintiffs to submit detailed billing records in support of their request for fees. (Dkt. No. 52.)

In response, Plaintiffs filed an administrative motion to seal a document from the Brennan & David Law Group entitled "Time Entries." (Dkt. No. 54-1.) The Time Entries document is a nine-page chart which lists billing entries in chronological order from June 27, 2017 through December 21, 2019 and identifies the total fees incurred as $231,889.25 based on 433.4 hours of work. (*Id*.) Plaintiffs provide no explanation for the discrepancy between the lodestar amount sworn to in the Martin Declaration ($160,895 based on 300 hours of work) (Dkt. No. 47-3 at ¶ 13) and the lodestar reflected on later-submitted "Time Entries" ($70,994.25 more in fees based on 133 more hours) (Dkt. No. 54-1.) No declaration or cover letter accompanied the detailed billing records.

Given Plaintiffs' failure to explain the discrepancy between the two documents which purport to identify Plaintiffs' lodestar, the Court declines use latter document as representative of Plaintiffs' lodestar. The initial lodestar figure at least was contained in counsel's declaration and submitted under penalty of perjury. The discrepancy with respect to Plaintiffs' lodestar and billing records is just the latest example of Plaintiffs' counsel's carelessness in the presentation of the settlement to the Court. (*See, e.g.,* Dkt. Nos. 30, 32.) Given the Court's concerns, the Court finds that the lodestar method, rather than the percentage of the fee method, is the most appropriate

method of calculating attorneys' fees in this particular case.  *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010) ("the lodestar method yields a fee that is presumptively [reasonable].").

### a) The Lodestar Method

The "lodestar" figure consists of "the number of hours reasonably expended multiplied by the reasonable hourly rate." *PLCM Grp. v. Drexler*, 22 Cal. 4th 1084, 1095 (2000).  A reasonable hourly rate is defined as "that prevailing in the community for similar work." *Id*.  As to the computation of hours, "trial courts must carefully review attorney documentation of hours expended." *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001). The Court must then exclude "hours that were not reasonably expended in pursuit of successful claims," *Harman v. City & Cty. of S.F.*, 158 Cal. App. 4th 407, 417 (2007) (citation omitted), "[a]ttorney time spent on services which produce no tangible benefit for the client," *Meister v. Regents of Univ. of Cal.*, 67 Cal. App. 4th 437, 452 (1998), and "duplicative or excessive" work, *Graciano v. Robinson Ford Sales, Inc.*, 144 Cal. App. 4th 140, 161 (2006).

### *1. Reasonable Rate*

To determine whether counsel's hourly rates are reasonable, the Court looks to the "hourly amount to which attorneys of like skill in the area would typically be entitled." *Ketchum*, 24 Cal.4th at 1133.  "The fee applicant has the burden of producing satisfactory evidence, in addition to the affidavits of its counsel, that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation." *Jordan v. Multnomah Cty.*, 815 F.2d 1258, 1263 (9th Cir.1987).  In addition, Civil Local Rule 54–5(b)(3) requires the party seeking fees to submit "[a] brief description of relevant qualifications and experience and a statement of the customary hourly charges of each such person or of comparable prevailing hourly rates or other indication of value of the services."

In support of their hourly rates, Plaintiffs submitted declarations from Ms. Martin and Ms. David which discuss their qualifications.  (Dkt. Nos. 47-3; 47-4.)  Plaintiffs also submitted a Request for Judicial Notice of a declaration from outside attorney Richard Pearl in *Ridgeway v. Wal-Mart Stores, Inc.*, No. 08-5221 SI, (N.D. Cal. March 27, 2017), describing the rates charged by attorneys in California and approved by courts in this District and other California courts.

United States District Court
Northern District of California

(Dkt. No. 47-2.)  Ms. Martin a 2002 graduate seeks an hourly rate of $742, and Ms. David, a 2012 graduate, seeks an hourly rate of $455.  These billing rates are reasonable and in line with prevailing rates in this district for personnel of comparable experience, skill, and reputation.  *See, e.g.*, *Roberts v. Marshalls of CA, LLC*, Case No. 13-cv-04731-MEJ, 2018 WL 510286 (N.D. Cal. Jan. 23, 2018), at *14-15 (N.D. Cal. June 22, 2017) (approving rates between $300 and $750 per hour); *In re Magsafe Apple Power Adapter Litig.*, No. 5:09-CV-01911-EJD, 2015 WL 428105, at *12 (N.D. Cal. Jan. 30, 2015) ("In the Bay Area, reasonable hourly rates for partners range from $560 to $800, for associates from $285 to $510, and for paralegals and litigation support staff from $150 to $240.")

### 2. Reasonable Hours

"Beyond establishing a reasonable hourly rate, a party seeking attorneys" fees bears the burden to "document[ ] the appropriate hours expended."  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  Counsel must exercise sound "billing judgment" as to the number of hours worked, eliminating excessive, redundant, or unnecessary hours, and provide billing records supporting the time claimed.  *Id.* at 433-34.  Here, as noted above, Plaintiffs initially failed to provide sufficient documentation to establish the reasonableness of their fee request.  Although Plaintiffs supplemented their motion with the "Time Entries" chart, the chart does not match up with Plaintiffs' motion for attorneys' fees and instead, seeks an additional $70,000 in attorneys' fees without explanation.  While the Court declines to increase Plaintiffs' request for attorneys' fees using this unexplained revised lodestar, the Court has reviewed the billing records contained in the chart and has numerous concerns regarding the reasonableness of the underlying fees sought.

As a preliminary matter, it is not appropriate for counsel to obtain fees for work the Court ordered them to redo.  *See Salamanca v. Sprint/United Mgmt. Co.*, No. 15-CV-05084-JSW, 2018 WL 1989568, at *3 (N.D. Cal. Mar. 9, 2018) (finding that "counsel may not seek recover of fees for the time spent correcting their mistakes. Counsels' repeated mistakes, however, reflect poorly on the quality of counsels' work during the approval process more generally.").  The Court denied Plaintiffs' first motion for preliminary approval as deficient.  (Dkt. No. 24.)  Plaintiffs were ordered to submit a new motion correcting various errors and deficiencies within 30 days.

Counsel did so, but the notice still had problems. (Dkt. No. 31.)  The Court granted preliminary approval only after counsel corrected the notice a second time.  (Dkt. Nos. 32, 33.)  Thereafter, counsel failed to file their motion for attorneys' fees and failed to create the website as required by the Court's preliminary approval order.  (Dkt. No. 36.)  The Court thus set a status conference at which it became apparent that various issues had arisen with the settlement including that notice had not been provided to the class—again, as required by the Court's preliminary approval order. (Dkt. Nos. 36, 37, 39, 40, 41, 43.)  Ultimately, the parties filed a stipulation modifying the settlement agreement and revising the dates for notice and final approval.  (Dkt. Nos. 44 & 46.) Counsel's request for fees in excess of $36,000 for the work spent redoing the motion for preliminary approval, traveling to the second preliminary approval hearing, responding to the Court's request for a status update, and traveling to and from San Francisco for the status conference is thus unreasonable.

Second, counsel billed over 60 hours for travel time.  These billing entries often combined the court appearance and travel time, but the bulk of the time entries reflect travel time.  *See Bell v. Vista Unified Sch. Dist.*, 82 Cal. App. 4th 672, 689 (2000) ("blocked-billing entries render it virtually impossible to break down hours on a task-by-task basis").  The Court is concerned that counsel consistently bills large blocks of time for travel from San Diego to San Francisco to attend hearings as counsel was presumably working on other matters or could have been during much of this time. (*See, e.g.*, Dkt. No. 54-2 at 5 (counsel each billed 3 hours for traveling to San Francisco for the preliminary approval motion on June 20, 2018); *Id.* at 6 (counsel each billed 4 hours to travel to San Francisco for the second preliminary approval motion on August 28, 2018); *Id.* at 7 (counsel billed 6 and 8 hours respectively for court and travel on December 13, 2018); *Id.* at 8 (counsel each billed 10 hours for traveling to and attending hearing the on the motion for final approval on April 4, 2019).)

Third, the billing records contain numerous excessive and block billing entries. For example, counsel billed 18 hours preparing a discovery plan and discovery requests.  (*Id.* at 2-3 (7/15/17, 7/16/17, 7/18/17 entries).)  On three separate days, counsel billed between six to eight hours each day reviewing and analyzing "PAGA data" for mediation.  (*Id.* at 3-4 (9/12/17,

United States District Court
Northern District of California

9/13/17, 9/18/17 entries).)  Again, over a three-day period the following month, counsel billed 8 hours each day for "Review and Analyzed CA Putative Class Sampling Data in Preparation for Mediation." (*Id.* at 4 (10/23/17, 10/24/17, 10/26/17 entries).)  In addition, as noted above, counsel routinely block billed for travel and court time.

Finally, the billing entries contain inconsistencies.  For example, the billing entries contain three *post-dated* entries.  That is, although the billing records were submitted on April 18, 2019, they contain entries for June 22, June 28, and December 21, 2019 for a total of 10 hours.  (Dkt. No. 54-2 at 8.)  None of these entries are recoverable and they give the Court further pause regarding the accuracy of counsels' billing records.  Likewise, a cursory comparison of the chart originally submitted with Plaintiffs' motion for attorneys' fees and the detailed billing records subsequently submitted suggests that in the detailed billing records, counsel has greatly increased the amount of time spent on each category.

### 3. Lodestar Calculation

Plaintiffs' lodestar is $160,895; however, Plaintiffs seek a fee award of $256,689 which would result in a multiplier of 1.595.  Although enhancements, also known as multipliers, are more prevalent under California than federal law, courts retain discretion to apply a positive or negative multiplier where appropriate.  *Compare Thayer v. Wells Fargo Bank, N.A.*, 92 Cal. App. 4th 819, 840 (2001), as modified (Oct. 25, 2001) ("our Supreme Court has repeatedly observed that a lodestar figure may be adjusted not just upward but also, where appropriate, downward.") *with Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000) (noting that multipliers may only be used to adjust the lodestar in "rare" and "exceptional" cases).  The Court finds that no enhancement of the lodestar figure is warranted here.  The lodestar figure itself consists of "the number of hours reasonably expended multiplied by the reasonable hourly rate." *PLCM Group*, 22 Cal.4th at 1095.  While the Court has concerns, as outlined above, about the reasonableness of the lodestar figure itself, rather than adjusting those hours down, the Court instead declines to increase the lodestar through an enhancement.

Accordingly, the Court awards Plaintiffs their lodestar attorneys' fees of $160,895.

//

United States District Court
Northern District of California

### C.    Litigation Costs

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros,* 303 F.R.D. at 375 (citations omitted).  To that end, courts throughout the Ninth Circuit regularly award litigation costs and expenses—including reasonable travel expenses—in wage-and-hour class actions.  *See, e.g., LaGarde v. Support.com, Inc*., No. C12-0609 JSC, 2013 WL 1283325, at *13 (N.D. Cal. Mar. 26, 2013).

Here, the Settlement Agreement provides that Plaintiffs' counsel may obtain up to $20,000 in costs.  Counsel seeks nearly this full amount—requesting $15,208.91 in costs incurred to date plus another $2,000 in costs through final approval.  (Dkt. No. 47-3 at ¶ 18.)  Counsel has submitted an itemized list of costs which include mediation fees ($8,500), copies ($99), filing fees and document services ($624.95), round trip airfare from San Diego to San Francisco ($2,442.63), hotel expenses ($2,395.60), mileage ($176.32), parking ($235), taxis ($484.43), and Lexis Nexis ($250.98).  (*Id.*)  Generally, counsel may recover those out-of-pocket expenses that "would normally be charged to a fee paying client." *Harris v. Marhoefer,* 24 F.3d 16, 19 (9th Cir.1994) (noting that a prevailing plaintiff may be entitled to costs including, among other things, "postage, investigator, copying costs, hotel bills, meals," and messenger services).  Here, however, the amount of certain costs is unreasonable.

*Flights*—Counsel requests $2,442.63 for travel to attend court hearings.  (Dkt. 47-3 at ¶ 18.)  Both Ms. Martin and Ms. David appeared for the preliminary approval hearing on June 21, 2018 (Dkt. No. 24) and the second motion for preliminary approval on August 30, 3018 (Dkt. No. 31), as well as the status conference the Court held on December 13, 2018 (Dkt. No. 42).  Because these latter two appearances were only necessary because counsel had either not filed a proper motion for preliminary approval or complied with the Court's order on preliminary approval (*see* Dkt. No. 36), the Court reduces the amount of associated costs sought by 50 percent; that is, to $1,221.32.

*Lodging*—Counsel requests $2,395.60 for lodging related to attending two court hearings in San Francisco and the mediation in Los Angeles.  (Dkt. No. 47-3 at ¶ 18.)  For the same reason

United States District Court
Northern District of California

the Court reduced the recoverable costs for flights for the second preliminary approval hearing and the status conference, the Court reduces the amount sought for lodging by 25 percent; that is, to $1,796.7.

*Taxis*—Counsel requests $484.43 for taxi costs for travel between San Francisco Airport and the courthouse for the two preliminary approval hearings and the status conference. (Dkt. No. 47-3 at ¶ 18.) This amounts to an average cost of $80 per taxi ride. The Court finds this amount excessive for the same reason the requested airfare expenses were unreasonable and because this overstates the average costs of a taxi from the San Francisco Airport from the courthouse. The Court thus reduces this amount by 50 percent; that is, to $242.22.

Accordingly, the Court will grant Plaintiffs' request for litigation expenses in the amount of $13,146.49.

### D. Incentive Award

Finally, Plaintiffs request that each of the three named Plaintiffs receive an incentive award of $10,000 to compensate them for their time, expenses, and service.

"Incentive awards are fairly typical in class action cases." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). However, the decision to approve such an award is a matter within the Court's discretion. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). Generally, incentive awards are meant to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaking in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958–59. The Ninth Circuit has emphasized that "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Solutions, Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks and citation omitted). In determining whether an incentive award is reasonable, courts generally consider:

> (1) the risk to the class representative in commencing a suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit (or lack thereof) enjoyed by the

class representative as a result of the litigation.

*Covillo v. Specialtys Café*, No. C–11–00594-DMR, 2014 WL 954516, at \*7 (N.D. Cal. Mar. 6, 2014) (citing *Van Vranken v. Atl. Richfield Co*., 901 F. Supp. 294, 299 (N.D. Cal. 1995) (citations omitted)).

A class representative must justify an incentive award through "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc*., 252 F.R.D. 652, 669 (E.D. Cal. 2008). In this district, a $5,000 payment is presumptively reasonable. *See Harris v. Vector Marketing Corp*., 2012 WL 381202, at \*7 (N.D. Cal. 2012) ("Several courts in this District have indicated that incentive payments of $10,000 or $25,000 are quite high and/or that, as a general matter, $5,000 is a reasonable amount.") (citations omitted).

Plaintiffs contend that a $10,000 award is appropriate because they each spent a substantial amount of time and energy contributing to the investigation, prosecution, and settlement of this case, they each executed a general release, and the lawsuit has affected their personal and professional reputations. (Dkt. Nos. 47-5 at ¶¶ 4,7 10; 47-6 at ¶¶ 4,7; 47-7 at ¶¶ 4,7.) While the Court acknowledges that there is a basis for an incentive award here, the Court concludes that an award of $10,000 each is excessive.

First, an award of $10,000 is disproportionate to the average class member's recovery. Courts weigh the proportionality between the incentive payment and the range of class members' settlement awards, when considering whether a requested incentive award is reasonable. *See Lopez v. Bank of Am., N.A*., No. 10-CV-01207-JST, 2015 WL 5064085, at \*8 (N.D. Cal. Aug. 27, 2015) (collecting cases). An incentive award of $10,000 is approximately 4.1 times greater than the average class member award of $2,440. This discrepancy weighs against the requested incentive award here.

Second, given that this case settled an early stage, none of the plaintiffs played a particularly active role in the litigation. Courts consider a plaintiff's role in the litigation when assessing the reasonableness of an incentive award. *See, e.g*., *Fleury v. Richemont N. Am, Inc*.,

No. C–05–4525 EMC, 2008 WL 3287154, at *6 (N.D. Cal. Aug. 6, 2008) (awarding $5,000 incentive award where plaintiff was involved in litigation for three years, sat for a deposition, responded to written discovery, and attended a mediation session); *Burden v. SelectQuote Ins. Servs.*, No. C 10–5966 LB, 2013 WL 3988771, at *6 (N.D. Cal. Aug. 2, 2013) (awarding $5,000, rather than requested $10,000, where the named plaintiff "was deposed twice, attended three settlement conferences, and spent a total of 80 hours" on the case); *Garner v. State Farm Mut. Auto. Ins. Co.*, No. C–08–1365 CW (EMC), 2010 WL 1687832, at *17 (N.D. Cal. Apr. 22, 2010) (approving a "well justified" award of $20,000 to the single named plaintiff who lent her name to the case, thereby "subjecting herself to public attention," and "made herself available for deposition on two separate occasions, wherein she was subjected to questioning regarding her personal financial affairs and other sensitive subjects; met with the class counsel on six separate occasions; attended the full-day Court-ordered appraisal hearing; spoke with the class counsel and their staff on many occasions; reviewed all major pleadings; and repeatedly responded to interrogatories and document requests.").

Here, each Plaintiff attests that they performed the following identical tasks: retaining experienced counsel, engaging in extensive meetings with counsel and reviewing pay records, reviewing documents related to employment with Tesla, "facilitating the settlement process by reviewing the proposed terms, discussing them with the other class representatives and providing feedback," and coordinating meetings and discussions between counsel and other members of the class. (Dkt. Nos. 47-5 at ¶ 10; 47-6 at ¶ 10; 47-7 at ¶ 10.) Each of the plaintiffs attests that they spent between 75-90 hours on this action—that is, two 40 hour weeks of work on this action. (*Id.* at ¶ 11.) However, none of the plaintiffs was deposed, none attended the mediation, and Plaintiff Segal was not added as a plaintiff until the day Plaintiffs filed their motion for preliminary approval (she nonetheless indicates that she spent the most time—at least 90 hours on this action). Under these circumstances, the Court finds that Plaintiffs' generic statements regarding how they assisted the attorneys in the litigation fail to justify the requested $10,000 incentive award.

Third, while each of the plaintiffs attest that the litigation has had a negative impact on their personal and professional reputation and that "numerous articles" appear when they type

their name into the Google search engine, including ones that "include false information about me and/or reach incongruent results," Plaintiffs have not attached any of these articles.  (Dkt. Nos. 47-5 at ¶ 8; 47-6 at ¶ 8; 47-7 at ¶ 8.)  When the Court googled Plaintiffs Hughes and Segal—only one article appeared which quoted their allegations from the complaint.  *See* https://jalopnik.com/why-teslas-sales-staff-say-theyre-behind-shortchanged-i-1826206999 (last visited March 19, 2019).  The Court is mindful that participation in wage-and-hour actions involves reputational risk, *see Rodriguez*, 563 F.3d at 958–59, but finds that the risk here is not so great as to justify deviating from the standard $5,000 incentive award.

Finally, the incentive awards will be paid from the settlement fund and thus reduce the settlement amount available to the class.  This fact, too, weighs against a departure from the standard $5,000 incentive award.  *See Lopez*, 2015 WL 5064085, at *9 (noting that where the incentive award comes from the settlement fund the "[a]n increase to [the named plaintiffs] comes at the class's expense. This fact also weighs against an upward adjustment from the presumptive $5,000 award.").

Given the foregoing, the Court concludes that the presumptively reasonable incentive award of $5,000 each is appropriate to compensate Plaintiffs Wilson, Hughes, and Segal for the time and effort they spent in connection with this litigation and the risks they took on behalf of their fellow class members.

## CONCLUSION

For the reasons described above, the Court GRANTS Plaintiffs' motion for final approval of the parties' settlement. In addition, the Court GRANTS IN PART Plaintiffs' motion for attorneys' fees, costs, and incentive award.  Specifically, the Court awards the following: $160,895 in attorneys' fees; $13,146.49 in litigation costs; $15,000 to the settlement administrator, ILYM Group; and $5,000 each to Plaintiffs Wilson, Hughes, and Segal, as class representatives.

**IT IS SO ORDERED.**

Dated: July 8, 2019

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

27